STATE *ex rel.* LEGAL REDRESS COMMITTEE OF AFRICAN
METHODIST EPISCOPAL CHURCH *v.* SUNDAY SCHOOL
UNION OF AFRICAN METHODIST EPISCOPAL CHURCH

(*Nashville*, December Term, 1947.)

Opinion filed May 3, 1948.

FYKE FARMER and J. CARLTON LOSER, both of Nashville, for State *ex rel.* Legal Redress Committee.

Z. ALEXANDER LOOBY, of Nashville, for Sunday School Union.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The State of Tennessee, on relation of certain named persons, who constitute the "Legal Redress Committee of the African Methodist Episcopal Church," filed its original bill in the nature of a *quo warranto* proceeding against the defendant, a general welfare corporation which was organized under the laws of the State of Tennessee. The State, as the complainant, seeks a decree declaring a forfeiture of the defendant's charter and thereby dissolving it and ending its corporate life.

It is alleged in the bill that the General Conference of the Church instructed the relators by formal resolution to institute this proceeding.

The African Methodist Episcopal Church was organized more than a century ago. The affairs of the Church are under the supervision of the General Conference,

which meets every four years. In 1882, there was set up a departmental organization, known as the "Sunday School Union," whose special duty it was to furnish literature and textbooks for use in Sunday Schools. In 1889, Charles S. Smith, Secretary of the Conference, and four other church members, incorporated the "Sunday School Union," as provided by the Acts of 1875, the charter being in the usual form of general welfare charters. The name of the corporation was "Sunday School Union of the African Methodist Episcopal Church." The corporate purposes are stated in the charter as follows: "The objects of said corporation shall be to organize and carry on Sunday School work among the people of the United States of America and elsewhere, to unite and extend the same, to encourage the holding of normal institutes for the training of Sunday School teachers, to print and publish religious literature and sell the same, also to print and publish any other kind of literature that may be approved by the Board of Managers and to sell the same to Sunday Schools or to persons engaged in promoting the religious, moral and intellectual welfare of society, to impart information concerning the best method governing, conducting and equipping Sunday Schools and to equip the same in every particular and that all of said operations shall be under the control and direction of the General Conference of the African Methodist Eqiscopal Church and subject to its orders, laws and directions."

Prior to the issuance and registration of the charter, the Secretary of the Conference held title to certain real estate as trustee for the Sunday School Union. He conveyed all of this property to the corporation and the latter held it subject to the "express direction of the

General Conference." It is not disputed but that all the property, to which the corporation held title, belonged to the General Conference of the Church.

From the time the Sunday School Union was incorporated the said General Conference also claimed the right of absolute control over all the activities of the corporation, including the election of corporate officials. This right was exercised continuously for thirty years without being questioned by any one. This Court, however, in *State ex rel.* v. *Ira T. Bryant* (unreported), held that the General Conference of the Church did not have the legal right to name the board of directors and affairs of the corporation because the Act of 1875 makes no provision for the control of a general welfare corporation, such as the Sunday School Union, by the church establishing it. It is important in this connection to note that in the same case the Court, in considering the charter provision giving the General Conference full authority over the corporation, said: "However, the provision, although not properly included in the charter, might well be regarded as a *recognition on the part of the incorporators of the trust character of the corporation."* (Italics ours.)

We think it is clear from an examination of the record, including the history of organization of the corporation, that it was chartered for no purpose other than to serve the African Methodist Episcopal Church.

The truth of the foregoing statement is fully confirmed by the holding of the U. S. District Court, and later the U. S. Circuit Court of Appeals, that all the property of every kind and character held by the corporation and valued at over $200,000 should be turned over to the *cestui que* trust, the African Methodist Episcopal Church. *Sunday School Union of Africa M. E. Church* v. *Walden,*

6 Cir., 121 F. (2d) 719, 722. In discussing the relationship between the Sunday School Union and the A. M. E. Church and referring to the former as the "trustee" and the latter as the "*cestui que* trust," the U. S. Court of Appeals, said: "It was founded and financed by the church, and it operates virtually as the publishing agent of the church, selling its publications to the various church groups. As in *Helm* v. *Zarecor*, 222 U. S. 32, 32 S. Ct. 10, 56 L. Ed. 77, it is evident that the Union was incorporated merely as a *convenient instrumentality for the publishing work of the church.*" (Italics ours.)

When this suit finally came to an end in the U. S. Court of Appeals, the Sunday School Union, as a corporation, had nothing left except its charter. The U. S. District Court held that "it had no power to dissolve the corporation, as that can only be done in a proceeding brought by the state." (121 F. (2d) at page 720.) This holding was later affirmed.

Thereafter this suit was brought by the State in the nature of *quo warranto* to dissolve the corporation. The Chancellor dismissed the bill.

The learned Chancellor concluded his opinion by holding that the defendant corporation had not "by neglect, non-use, abuse or surrender, forfeited its corporate rights." There was a broad appeal to this Court and errors assigned, all of which question the correctness of the Chancellor's opinion and final decree.

It plainly appears from the Chancellor's opinion that his refusal to declare a forfeiture of the charter was because the activities of the corporation involved a public interest. He says: "The transgression must be material and serious and such as to harm or menace the public welfare, because the State does not concern itself

with quarrels of private litigants, and only interferes as a party where the public interest requires its action."

. The fundamental error of the Chancery Court was in considering the Sunday School Union as a public corpora-: tion and in holding that its activities were affected with a public interest. We find no fault with the general principle announced by the Chancellor in cases where the forfeiture of a charter of a public corporation involves a public interest. Whether a corporation is public or private is ofter difficult of determination. In Fletcher Cyclopedia Corporations, Vol. 1, Sec. 49, it is said: "A classification of corporations, universal and fitted to all ends, probably cannot be laid down."

In the same volume, at page 202, the author says: "If a corporation is of such a character as to be a private corporation, the fact that the legislature has in its charter declared it to be a public corporation does not make it so."

If the corporation with which we are now dealing were a public or *quasi* public corporation it might have the right to a continued existence even though it has ceased to serve the purposes of the original incorporators. It is not necessarily a public corporation because of its general charter provisions, for the reasons stated by Fletcher, *supra*. From the time it became a valid legal entity, it was : a non-profit organization serving only a single group of persons, to wit, the A. M. E. Church. It was and is the child of the church; it derived nothing from the State except the right to be a corporation and to exercise the authority granted.

If this corporation has a right to perpetual existence, it must be upon the theory adopted by the Chancellor that it is in some way affected with a public interest. But

such a theory has no basis in law or in fact, as shown by the U. S. Court of Appeals opinion in *Sunday School Union, of African M. E. Church* v. *Walden, supra,* wherein every vestige of property, to which it held the legal title, was ordered turned over to representatives of the A. M. E. Church. The effect of this holding was to render the Sunday School Union financially impotent. In this situation its corporate life to all intents and purposes was at an end.

Conceding that the corporation may possess some of the attributes of a public or *quasi* public character, its charter should be forfeited if its continued existence amounts to a fraud on the public, or is injurious to those who gave it life and without whose aid it would be entirely bereft of any existence. There is no question in the mind of the Court but that its perpetuity would now be a manifest fraud. For fifty years it held itself out as the sole agent and trustee of the church in the publication of religious literature, all of which was under the control and express direction of the African Methodist Episcopal Church. Since its practical dissolution by the U. S. Circuit Court of Appeals, those who were once active in its management are now attempting to carry on the same business under the same charter and immediately across the street from the same location. This is a flagrant deception and amounts to the abuse of corporate authority.

For this Court to refuse to grant the relief sought by complainants would be to give aid to a manifest fraud. Moreover, it would be a wrong against the A. M. E. Church in that it would enable a few individuals to reap where this great church has sown.

Responding to the motion of appellee to dismiss the appeal because of the failure of the appellant to file assignments of error "as required by the rules of this Court," we disallow said motion for the reason no one has been prejudiced in the least. The object of the rule is to expedite the hearing of causes. But for the rule referred to, counsel would often ask that cases be passed to permit the filing of briefs and assignments of error. Where it appears, however, as in the instant case, that there has been no delay in the hearing, and no one is prejudiced by the failure to comply with the rule, the case should be heard on the merits.

The assignments of error are sustained and the decree of the Chancery Court reversed. An order will accordingly be entered canceling the charter and dissolving the corporation. The cause is remanded for such further orders as may be consistent with this opinion.

All concur.